Good afternoon, everyone. We have two cases on the calendar this afternoon, and counsel, I've been advised, is present and ready in both, so I'm not going to read the calendar. Judge Walker is rounding out this panel. He's indisposed today, so he is listening on the live stream and will participate in our deliberations, but he couldn't be here today. I think we are ready to proceed. The first case is National Association for Gun Rights v. Lamont. May it please the court, my name is Barry Ehrink and I represent the appellants here today. So, it is the state's position that it is constitutional to ban so-called assault weapons, even though the numbers show that 99.998% of those assault weapons, so-called, were not used in homicides in 2022. And even the state admits that they're relatively rare usage in criminal activity. And so the state is saying that millions and millions of people can be disarmed of this particular weapon. As a matter of fact, the most popular weapon in America, the AR-15, because literally a handful, a couple of dozen, have misused them, that this is not the law. Go ahead. But your view would be that the frequency of use in crime doesn't matter or does matter at what point? So basically, that was actually, if you look at Como, the court itself has already said, compared these arms to handguns and said handguns were overwhelmingly, orders of magnitude, more likely to be used in crime. Yet the Supreme Court said that they were protected anyway because they were in common use for lawful purposes. So this is not my view. This is the second view, Circuit's view in Como. It's the Supreme Court's view in Heller. Do you think we're bound by any aspect of Como? I think that you are bound by the part of Como that was not abrogated by Bruin. And is not inconsistent with Bruin. It's where the court talked about, are these in common use? Even the most conservative estimates, the court said in Como, these are in common use, these rifles and the magazines. Now, in terms of were they in common use for lawful purposes by law-abiding citizens, the court assumed that in Como, but it needn't assume that in this case because the evidence is overwhelming on that regard. The state admits it. Could you compare this weapon to the M16? How is the AR-15 different from the M16? So an AR-15 is on a similar platform to an M16, but the crucial difference is an AR-15 is a semi-automatic where there's only one shot per pull of the trigger, and an M16 is fully automatic. Now, an M16, Heller said, is the type of use military weapon that is not common in society. On the other hand, an AR-15, as the evidence is undisputed, is very common in society. So run your analysis of the M, I mean, the M16 isn't presumably in common use because it's been banned, right? The M16 is a machine gun, and the National Firearms Act does not actually ban the M16s. It regulates them heavily. Lots of states have banned them. But Heller said it could be banned, right? Yes, Heller said it could probably, yes. Do you disagree with that? So basically, Heller said what separates lawful weapons from the type of weapons of M16s and the like that may be lawfully banned. That's what Heller said. And what it separated is Do you think the Supreme Court was wrong or we shouldn't apply that in some way? No, I think that the Supreme Court was certainly correct that M16s as machine guns, no one is standing here today arguing that machine guns cannot be lawfully banned under Heller. Well, I guess what I want to understand is under your analysis that you're proposing we adopt following Bruin and Rahimi here, can M16s be lawfully banned and run M16s through your analysis for me so I understand how to apply your two steps. So my analysis for M16s would be the same as Heller's analysis for M16s. First, they're the arms. Step one, easy. Second, are they the type of weapon that are unusual in society at large? And that's what Heller called an M16. Yes, it may be lawfully banned under Heller's own analysis, which I don't disagree with. But the problem with the state is that analysis doesn't apply when we're talking about How many M16s were in circulation? Was it at the time of Heller is the question? In 2008, how many M16s were at the time of the prohibition against their possession? What's the relevant? So the machine guns began to be regulated in 1934. And so it has never been So under your analysis, would the question, if we were kind of traveling back in time and applying the analysis you're telling us to apply to M16s, would the question be how many weapons, how many M16s were in use by the civilian population, excluding law enforcement in 1934? Or how do you do it? Heller specifically addressed this issue and said in 1934 it was permissible to ban machine guns. And that's, and so And so do I understand what it means to apply that common use formulation? What did that mean in Heller? How many were in common use? What's the constitutional line you want that is drawn? If it's not the functionality of the weapon, which I don't understand you to be arguing, right? Correct. If the federal ban were lifted and M16s proliferated, you would say that the Constitution protects that weapon going forward, wouldn't you? So if M16s became in common use for lawful purposes under Heller and Bruin, they would certainly be lawfully possessed by citizens. Now, this is obviously a hypothetical situation and doesn't apply to this case. It's not like, you know, someone lands from Mars, hypothetical. It's what if Congress decided to deregulate that weapon? Then it would be the people of the United States have the, have the ability to deregulate weapons if they want to. I would certainly argue that. So, so let me ask then, I want to, I still don't think I have an answer. In, in, if you're applying your test of common use, how many were in circulation at the time of Heller when the Supreme Court said that they're, they're not in common use, therefore not constitutional? How many M16s were in circulation at the time of Heller? The court did not inquire. Uh, there, there are zero, uh, M16s, uh, that were not regulated by the National Firearms Act. Uh, they were very heavily regulated, uh, as machine guns. And so that's why Heller was able to say that they were not in common use. So that it was the Congress's decision to regulate them that defined the evolving view of the second amendment that you're So it's not an evolving view of the second amendment. It's an evolving view of what's in common use. Bruin specifically said with respect to handguns. Sounds like an evolving standard of frequency to me. Right. Something can be frequent, uh, in common use at one point in time and not, and, and become in common use. That's what Bruin said. And one line is constitutional and the other line is not. So this is what Bruin said. It said that during the time of the founding, uh, just prior, handguns were perhaps deemed, uh, dangerous and unusual. But today there is no question that they're in common use for lawful purposes. So exactly what the court is suggesting happened. Uh, Bruin has basically said, And what's your understanding of the, of the line? My view of the line? Yeah. Common use. It's not a, it's not an absolute number, but I was certainly tens of millions are in common use with respect to the, uh, um, rifles. Uh, certainly over a hundred million is in common use with respect to, um, magazines. If, if the most popular rifle in America is not protected by the constitution, then none is. Can I ask about, um, I mean, in the fourth amendment context, when a technology becomes widely available and that technology allows, uh, members of the public to know information about others, say about the interior of a home, that they couldn't have known before that technology. It generally, it generally, not invariably, but it means something is outside the scope of the fourth amendment. Uh, I think Justice Scalia said that in Kylo. This seems to work in the, in the reverse, that common use plays such an important role in your analysis in determining this, bringing something within the scope. It's almost defines the scope of the fourth amendment. I mean, the second amendment. Am I missing something or is, is that not an inaccurate characterization? And why do you think it works that way? I see that my time is up. Go ahead, please. And, and so, uh, the answer is that, uh, Heller, uh, says in no uncertain terms, that in order to bring for a state to justify its regulation, it must go back to the founding era and point to a regulation at the founding era that is analogous to the, to the one that, that it has in place. And there were no regulations. There were no bans of arms in common use at the time of the, so the, the, uh, the plaintiffs only have to prove that they're, they're arms. The state has to prove that they're dangerous and unusual. By definition, something that's in common use is not dangerous and unusual. That's how the, the, uh, the Heller and Bruin test, uh, operates. Can I, can I just ask that you obviously put a lot of emphasis on the phrase you just used, the dangerous and unusual. Um, why can't that mean, as the lower court suggested, unusually dangerous? Because then you're right back into freewheeling interest balancing where courts get to decide, well, that's just normal dangerous. That's too much dangerous. That's exactly what Bruin says the courts can't do. That's an empirical judgment that Bruin said the courts can't make. Well, I mean, they said you can't do, uh, interest balancing. Fit means fit test, but why isn't the question, if the, if you put so much focus on this language, we should understand what it, what it means, right? What is dangerous and unusual mean? And I wonder why dangerous and unusual can't mean unusually dangerous. Because those are not the same thing. Dangerous and unusual as is. So, so context I think matters. So an example, uh, one of my law clerks suggested to me, if I look out the window and I see, um, uh, a fat squirrel and I say, whoa, look at that squirrel. It's nice and fat. I don't mean kind and obese. I mean nicely fat. He's obese. So why can't dangerous and unusual mean unusually dangerous? Well, I can say... As a grammatical matter. If we're examine, trying to discern that meaning, which you've put great emphasis on that language, why, why don't we try to figure out what that means? Well, Justice Alito has given us some help on this, in the Catano case, of course. In a concurrence. Where he says it's a conjunctive test. It has to be unusually dangerous and unusual. And where does it come from? So it's, it's, it comes from Heller originally. So it does come from Heller. And it's a quote. It's a quote in Heller. Dangerous and unusual. What is it quoting? Actually, it, it, there's 12 sites following that. So it talks about the historical tradition of banning dangerous and unusual weapons. In quotes. And it has 12 sites. Yes. All 12 of those sites refer to dangerous and unusual weapons. And what were those sites dealing with? They were talking about the common law offense of affray. Going armed to terrorize the population. And those very sites say... They're not about, they're not about weapons. Yes, they are. Those very sites say that you cannot commit the offense of affray with commonly used weapons. Yes. Well, the danger... So it's quoting something. Rahimi actually says it's citing Blackstone. Do you agree with that? Blackstone? Blackstone. Blackstone. Yes. Blackstone. That's the first site, isn't it? Yes. Blackstone does talk about... After dangerous and unusual are quoted? Blackstone does talk about the common law offense of affray. Yes. But does Blackstone say dangerous and unusual? So the sites, if you go back to them, they talk about dangerous and unusual. So the first one, for Blackstone, I think it's 89 to 90. It's 1769, which I think is the fourth edition. What is the quote? Do you know what it is? I do not know exactly what Blackstone says. I can tell you. But whether it says dangerous or unusual or dangerous and unusual... I do know. Because some of them said dangerous or unusual. Some of them said dangerous and unusual. Heller said dangerous and unusual. And I think the court's bound by what Heller said. Well, it quoted Blackstone as dangerous and unusual. And in fact, as you know, Blackstone said dangerous or unusual. So I'm just trying to... You're saying put this great emphasis on and. I don't even... As I gave you from my nice and fat example, that might mean unusually dangerous. I don't know. I try to figure that out. What's the context of this phrase that you've put such enormous emphasis on? And so I look at the Blackstone quote, which Rahimi says dangerous and unusual is citing. And it's dangerous or unusual. But Heller said dangerous and unusual because several of those go on to the next. I've actually done this analysis. There's 12 of them. Six of them use the disjunctive. Six of them use the conjunctive. Correct. But what did Heller do? This course is not bound by Blackstone. It's bound by Heller. Heller used the conjunctive, which just as Alito at least thought was significant. Rahimi says dangerous or unusual, doesn't it? I don't remember Rahimi saying that. But the test in Heller was the common use test. And if it's in common use, it cannot be dangerous and unusual. And so just again, what... Like, how do you... Let me ask you a couple of questions. What's your... You just think it's a numerosity question, a numbers of proliferation question. Can I ask when? When do we look at the question? Is it at the time of the enactment of the ban? Is it at the time we decide the appeal of this preliminary injunction? Is it... When do we look and ask the numerosity question? Everyone answered this question when it said whatever the case was, whether pistols were dangerous and unusual back then, there's no question that they're in common use for lawful purposes today. So you look today.  So does it go in the other direction? Obviously, you say if it proliferates... If the legislature didn't act in time to do what it did with the M-16s and it proliferates into common use, Second Amendment says hands off, no future regulation. At least that's a ban. What if the suit... What if it takes you a long time to file a lawsuit? Does it go the other way? If there's a de-proliferation of these weapons, does the meaning of the Second Amendment change again to allow regulation? So the meaning of the Second Amendment never changes. It's fixed in time in 1789. And the application of the Second Amendment, according to Heller, is whether it's in common use for lawful purposes today. So we look today. And if any particular weapon is not in common use for lawful purposes today, then it's not protected. So we look today. Today is the question. Today. And not tomorrow, not when the law was passed in 2013. Today. Today. Okay. Thank you. Thank you. Good afternoon. I'm Josh Perry from the Connecticut Attorney General's Office. I'm here today on behalf of Governor Lamont and the other defendants in this case. Almost 40% of the United States population lives in a state that, like Connecticut, New York, and Vermont, chooses to protect public safety by restricting assault weapons, LCMs, or both. Plaintiffs want this court to split with its peers on the First, Third, Fourth, Seventh, and Ninth Circuits and become the first appellate court in the country to enjoin those restrictions. This court should decline and affirm for at least four reasons. And I want to start with the questions that both of you asked Chief Judge Livingston and Judge Nathan about numerosity, about Cuomo, about M-16s versus AR-15s, and about unusual dangerousness. Because all of those go to the reasons why plaintiffs cannot clear their threshold requirement here of showing that Connecticut has infringed on any constitutionally protected right. And if I can get through that within my time, I'd like to touch on the historical— Well, just because you lay it out doesn't mean we don't have questions. I understand, Your Honor. Before you get to those questions, I asked your colleague about the M-16. Can I just ask you if you could help me distinguish between the assault weapons that are prohibited by Connecticut's ban and a semi-automatic hunting rifle, or would a semi-automatic hunting rifle fall within the ban in many instances? It might, depending on its features. So Connecticut restricts weapons based on their brand and make and also based on their combat functional features, to quote from the Fourth Circuit in Colby, that make them unusually dangerous, that make them like the M-16 assault rifle, which we know is bannable. And I appreciated opposing counsel's concession that the Supreme Court in Heller did not consider or inquire into the M-16 rifle's numerosity when it pronounced that it was, in fact, bannable. Because, of course, numerosity doesn't matter constitutionally to any right. It doesn't matter to the Fourth Amendment. It certainly doesn't matter to the Second Amendment as well. But going directly to the court's question— Well, it kind of used to matter in the Eighth Amendment, right? We used to look at whether something was unusual by looking at the number of states that permitted it. So that's not a totally foreign concept. I think the court's clarification is exactly right, Judge Nathan. What used to matter is the number of states that do something. But nobody ever suggested until this line of cases came along that what matters is the choices of the consumerate and manufacturers. In other words, we don't count individual possessions. We don't count individual people who are committing crimes when we do our Eighth Amendment. Well, this is— We do something sort of similar in the Fourth Amendment sometimes when we say that if a technology has become widely available, even though it reduces the scope of privacy, it's suddenly outside the Fourth Amendment as well. The government can use it if the people are using it. So it affects the scope of the Fourth Amendment. It's not exactly numerosity of owning something, but it's a wide availability of technology. Sure. So dissemination into the marketplace can be relevant here as well because it goes into when the state has the prerogative or the need to regulate. That goes to the unusually dangerous and the historical analog elements because, of course, a state doesn't feel any need to regulate and wouldn't regulate until an instrumentality becomes so prevalent in society that it becomes the kind of threat that assault weapons are now. But I do want to respond directly to your point, Chief Judge Livingston, excuse me, about the weapons that Connecticut regulates and restricts versus the one that it doesn't. So Connecticut restricts instrumentalities that are unusually dangerous, that are like M16 rifles, that have combat functional features, that allow users to hose down, as one of our declarants put it, a battlefield or, tragically, a school and cause a disproportionate number of casualties. Those are the pistol grips. Those are the muzzle shrouds. Those are the forward grips that give a shooter the leverage, the aim, the capacity to take too many lives as the shooters did at Sandy Hook in too little time. So Connecticut has calibrated its restrictions precisely to the constitutional contours by ensuring that we restrict weapons only that are unusually dangerous and only the ones that are like the M16 rifles. And let's talk about the ways... Can I ask about Cuomo? So obviously we have intervening Supreme Court precedent, but it's not clear to me if all of the pieces of Cuomo have been abrogated such that we're not bound by them. And I guess one question is, are we bound by Cuomo's conclusion that these weapons are in common use? So the answer to that is no. Important parts of the threshold inquiry as Cuomo articulated are still compelling and perhaps binding on this court. But the court in Cuomo specifically requested or sought further guidance from the Supreme Court and from its sister circuits. And the court, as the district court noted, has gotten that further guidance. So let me observe one thing about Cuomo. If Cuomo is still in force, if Cuomo is still binding, then plaintiffs cannot get their preliminary injunction. Well, if the whole thing, for sure. Sure, but even if... My question is, are there pieces of it? I mean, we know, whatever we know, we know that what Cuomo did in Step 2 is no longer good law. There's not a lot we know here, but I think we know that. And Judge Nathan... But what about Step 1 and what Cuomo did in Step 2? Judge Nathan, once again, I appreciate your clarification. Yes, I was talking about Step 1 of Cuomo. I think we can agree that Step 2 was abrogated by Bruin. But as to Step 1, Bruin recognized that a test that looks very much like New York's Step 1 test was broadly acceptable as the threshold test for whether an instrumentality implicated or restrictions on instrumentalities implicated any constitutional right. And I'll readily concede that that's still true. But again, to the extent that Cuomo's Step 1 is still the law, plaintiffs can't have their P.I. here. Why is that? So Cuomo looked at the threshold test and essentially threw its hands up and said, we can't make this determination on this record. So it went on to Step 2. But if that's true, plaintiffs can't carry their burden. Tell me if this is the wrong way to read Cuomo. It understood Step 1 as sort of common use for lawful purposes. And so let's say it's Step 1A and 1B. And 1A, it said, in common use. 1B, it said, we'll assume right for lawful purposes and conclude it's met and then moved on to Step 2. So I guess my specific question is, has 1A been abrogated? Is it a separate holding, and has it been abrogated? So I would say it's been clarified. But I do want to, and I want to expand on that, but I also just want to make the point about the standard of proof that plaintiffs have to bring here. So they have to show, at a minimum, that there's a likelihood of success on the merits. And if they couldn't carry their burden at Step 1, as Cuomo was written, I don't understand how they could carry it here to show that they get a preliminary injunction in this posture. But the point I would make as to that is, yes, I do think that the Supreme Court has clarified what common use means. So Bruin very clearly says, we're talking about common use for self-defense, not common possession, not mere numerosity, which is the only kind of statistics that plaintiffs try to deduce in what the First, Fourth, and Seventh Circuits have decried as a counting game. But instead, what's important is, how are these weapons actually used and useful? And I'd note that even Cuomo- And is that a law question? Is that a fact question? An expert? How do you do that? So it's a question of law that a court can decide based on the evidence that's in the record. And of course, because we're at the threshold stage here, it's plaintiff's burden to adduce that evidence. But even if the court thinks that plaintiffs have somehow carried that threshold burden, the state certainly adduced enough evidence that the weapon is unusually dangerous, which is also- And I don't want to elide that part of Cuomo. Cuomo also considered unusual dangerousness at Step 1. And it also considered whether a weapon is like the M-16 at Step 1. Yeah, but Bruins also says- I mean, Bruins can be difficult to parse. But it also says that the amendment's plain text, if the amendment's plain text covers a person's conduct, the Constitution presumptively applies. And putting into that Step 1, this burden of showing, on the plaintiffs, of showing common use for self-defense seems like a pretty heavy gloss on the plain text. So help me understand how you read Bruin that way. Of course. So plaintiffs bringing a constitutional challenge always carry the burden of showing that their claimed infringement on their rights falls within the scope of the constitutional text. It's true, of course, that Bruin does talk about the plain text. But what is the plain text? It's the plain text as historically understood. And what Heller and Bruin both point out is that the plain text of the Second Amendment as historically understood protects a right to self-defense, not a right to possess any type of weapon for any sort of confrontation, but instead going back to the English Bill of Rights of 1689, going back to Blackstone. And by the way, Judge Nathan, your point about Rahimi and Blackstone is exactly correct. And I do know the site. It's 144 Supreme Court, 1901, where Blackstone says that... Where Rahimi says... Where Rahimi says, exactly, that it's dangerous or unusual. Our historian, Saul Cornell, at page 1220 of the Grant JA, points out that the historical understanding, what they would have understood at the founding, was that that was a Hendieties. So in other words, it doesn't... That's my nice and fat squirrel. Yes, but honestly, and while I appreciate the analogy, it doesn't matter what Josh Perry or Judge Nathan would understand today. What matters is what the framers would have understood, and that's why Saul Cornell's testimony is important here, that the framers... And that testimony is uncontradicted by plaintiffs who offered no historical declarations whatsoever. What the framers would have understood is that that meant unusually dangerous. So I know that my time is up. Unless the court has other questions, I'll be seeing you again in just a few minutes. Could I just ask the facial... And I'll ask your colleague on the other side on rebuttal. Just the facial challenge, because I feel like the sand shifted a bit since the original briefing on this with Rahimi. But how do you understand what we look at for purposes of the facial challenge? Is it everything in the statute, or could it be subsections? And how do you understand what that means in this context? Yeah, so as you point out, Judge Nathan, the sands have shifted a little bit since Rahimi because Rahimi clarified that when a court is inquiring into a challenge to a statute, even under a Second Amendment challenge, there is no Second Amendment exception, and the court can stop looking when it finds one application of the statute that is in fact constitutional. That's what the court did in Rahimi. And of course, that's the rule that the Fourth Circuit just applied in Bianchi as well. But I think the best way to think about this rule of Rahimi, and by the way, it's a rule that this court embraced in Antonio, which I understand has been GVR'd, but I still find quite persuasive, as the Ninth Circuit recently did in Walford v. Lopez as well. I think the best way to think about this rule is as imposing a negligible but important pleading burden on plaintiffs. So when plaintiffs come to challenge an entire statutory scheme, what they're doing facially, what they're doing is saying everything in this statute is unconstitutional, and a court should preliminarily enjoin all of it without a full record, without a full trial, in this posture. Plaintiffs are the least cost avoider. They are the ones who are in the best position to say, but these are the parts of the statute that we just don't find difficult at all. And they can do that in their pleadings, they can align their pleadings with their offer of proof and with their request for relief. But if they don't do that, as neither set of plaintiffs did here, the burden is now thrown to this court on a fragmentary record on appeal from a preliminary injunction to separate the wheat from the chaff. So in other words, this rule presents what is not a very significant burden on plaintiffs at the time of pleading. They're the ones who are in the best position to know which parts of this statutory scheme they find difficult and which ones they don't. But if they don't take that minimal effort, it puts the district court, it puts defendants, it puts an appellate court ultimately in an almost untenable position. What is this court now to do? Sift through the entire statute, determine on its own, without full briefing on it, as to each instrumentality, which are constitutional and which are unconstitutional. This all could have been solved on the front end with some more specific pleading. And fortunately, if this court affirms, this can go back to the district court and plaintiffs can either clarify their pleading or align their proof with their pleading as it was originally pled. Thank you so much. I appreciate the opportunity to be here with you today. So addressing the last issue first, Antoinette essentially says, it's section by section. I understand Antoinette has been GVR'd, but that should be the rule. It has always been the rule. What sections are you challenging? I mean, you've challenged the whole thing. My friend's discussion just then, it totally ignores the evidence that was presented at the hearing, which overwhelmingly was about AR-15s and magazines. So it's not really a secret what we're seeking to adjoin and seeking to enjoin. It's a facial challenge to the ban of the most popular rifle in America. That's not hard to get to because it is overwhelmingly used. The state admits. I mean, again, I would urge you to... On magazines, can I ask you, is there, what's in the record? I mean, I gather that there's substantial differences in capacity for magazines. I'm sorry? There are substantial differences in capacity for magazines, right? Yes. It could be a 100-capacity magazine, for example, correct? So the magazine ban is anything under... Well, it basically eliminates most standard magazines for AR-15s, which are 30. Different question. Are there different capacity magazines? There are certainly different capacity magazines. So is there a 100... Now, the state certainly is welcome to come in and say, well, yeah, 30-capacity magazines might be tens of millions or hundreds of millions, but there's not that for 100-round magazines? That's the state's burden to demonstrate that there are... But you've challenged everything, so why is that their burden? For... Right, you... I mean, I'm just trying to understand in light of Rahimi, which is clear on what we do on a facial challenge, you've just said, I think, that you're just challenging facially AR-15s and LCMs. Is that what you're saying? So what I'm saying is, for example, the handgun ban in the statute, we don't have to talk about which handguns are banned, because Heller says you can't ban handguns. So you can... This court can strike that handgun ban facially. Heller said you can't... Heller said you can't... Heller spoke to whether you can ban... Handguns, yes. Well, all handguns, right? Yes. It said handguns. It didn't differentiate. Did it address the issue of whether a ban on... If there's an M-16 handgun, for example, if there's an automatic handgun, does Heller tell us whether it's bannable or not? So if it's a machine gun, it is subject to the National Firearms Act, and it also is then subject to... Well, if there's an automatic handgun, does Heller tell us that that can't be banned? So if it is a machine gun, which is the same as saying it's an automatic, that would be a different analysis.  So the fact that something's a handgun, you can't just point to Heller and say, aha, it can't be banned, right? It's the size of the weapon isn't what's determinative. I do take your point that there are certain handguns that are machine guns that probably could be banned. I see my time is up. Thank you. Thank you both.